IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

TERREL LEE BECKWITH,

                  Plaintiff,

vs.

ANDREW SAUL, Commissioner of
Social Security,

                  Defendant.

8:19-CV-319

MEMORANDUM AND ORDER

Terrel Lee Beckwith appeals from the denial, initially and upon reconsideration, of his application for supplemental security income (SSI) benefits under Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq.* The Court has considered the parties' filings and the administrative record. For the reasons discussed below, the Court finds that the Commissioner's decision was not supported by substantial evidence, so Beckwith's motion for reversal (filing 13) will be granted, the Commissioner's decision will be reversed, and the case remanded for further proceedings.

## I. PROCEDURAL HISTORY

On August 22, 2017, Beckwith protectively filed for supplemental security income, alleging disability beginning February 2, 2016. T10. His claim was denied initially and on reconsideration. T10. Following a hearing, the administrative law judge (ALJ) found that Beckwith was not disabled as defined under 42 U.S.C. § 1382c(a)(3)(A), and therefore not entitled to benefits under the Social Security Act. T19. The Appeals Council of the Social Security Administration denied Beckwith's request for review of the ALJ's decision. T1.

Accordingly, Beckwith's complaint seeks review of the ALJ's decision as the final decision of the Commissioner under 42 U.S.C. § 405(g). Filing 1.

## II. FACTUAL BACKGROUND

At the time of hearing, Beckwith was 61 years old and lived with his mother. T50-51. The record contains extensive evidence of Beckwith's years of psychiatric treatment, which the Court has thoroughly reviewed.[1]

To summarize, Beckwith has suffered a course of bipolar I disorder: a condition characterized by manic episodes of at least a week, and commonly punctuated by hypomanic episodes and major depressive episodes. *See* Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 123-32 (5th ed. 2013) [hereinafter "DSM-5"]. Most people who have a single manic episode go on to have recurrent mood episodes, and most manic episodes occur before major depressive episodes. DSM-5 at 130. Co-occurring mental disorders are common—most frequently anxiety disorders (about three-quarters of individuals), and substance use (primarily alcohol) disorder (over half of individuals). *Id.* at 132. Here, Beckwith was also diagnosed with generalized anxiety disorder, panic disorder, and depressive disorders. *See* T326, T800. And while only formally diagnosed by one provider, *see* T462, the record is replete with evidence that Beckwith abused alcohol. *See, e.g.*, T330-38, 346, 355, 421-23, 446, 676, 795, 893. Finally, during a manic episode, individuals often do not think they are ill or in need of treatment and can "vehemently resist" efforts to be treated. DSM-5 at 129. Not surprisingly,

---

[1] The primary issue on appeal is whether Beckwith's mental health conditions more than minimally affect his ability to complete work related tasks. *See* filing 14, filing 18. Therefore, while the ALJ found Beckwith to have severe physical impairments, those will not be discussed in detail in the Court's opinion. *See* T12.

Beckwith was frequently non-compliant with treatment plans, and at times denied being bipolar. *See, e.g.*, T335-38, 452-55, 460, 505.

## 1. Work History

From approximately 1985 to 2015, Beckwith was an investment banker with various firms—predominately Lehman Brothers and his own firm, REBC Capital, which he founded in 2007.[2] T46-48, T246. When he was self-employed from 2007 through 2015, he reported income in some years, but not others. T202-06. Beckwith last worked in any meaningful capacity in 2015. *See* T47, T202-06.

## 2. Medical History

Beckwith's first available mental health treatment records begin in September 2016, with psychiatrist Michael Egger, M.D. T325. However, the record indicates that Beckwith had been seeing Egger for many years by that point. *See* T325, T505.  On September 2, 2016, Beckwith visited Egger for follow-up medication management reporting that his mood was not very good after an increase in Lexapro, and that his wife had noticed that he was low energy and irritable. T325. Egger noted that he did not have pressuring of speech or flight of ideas, but that his progress was "moderately worse." T325. Egger changed Beckwith's prescriptions, and told Beckwith to return in 3 months. T325.

---

[2] Beckwith reported conflicting dates for his employment with Lehman Brothers and other firms, including Principal Financial Securities and First Union. At the hearing, he said he quit Lehman Brothers around 2003, and went to work for Principal Financial Securities, then First Union, then a "small firm" until founding his own company in 2007. T46-48. On his work history report in advance of the hearing, however, he reported working at Lehman brothers from 1985 to 2007. T246. The records from the Pension Benefit Guaranty Corporation suggest he worked at Lehman Brothers from 1986 until 1992. T181. And finally, his SSA earning report shows no income for the years 2002 through 2006. T202-03.

Later in September, Beckwith saw John Woodruff, M.D. for a rash on the back of his left thigh and possible psoriasis on his left foot. T477. Beckwith also wondered if he was having liver problems because of his medications. T477. Woodruff noted that "[h]e is convinced based on his experience that [the rash] is indeed shingles," and "[Beckwith's] father has psoriasis on his feet bilaterally," which is why Beckwith was concerned about psoriasis. T477. Woodruff ran blood tests that showed normal liver function and asked Beckwith if he would like those results sent to Dr. Egger. T479.

On December 1, 2016 Beckwith had a follow-up visit with Dr. Egger. T327. Beckwith reported "highs and lows with bipolar disorder," which seemed minimal at that time. T327. Egger adjusted Beckwith's medications, and noted that his cognitive function was preserved, he had good memory function, and that concentration, attention span, insight and judgment were all present. T327. Beckwith's progress was recorded as moderately improved. T328.

At the beginning of January 2017, Beckwith visited his primary care provider, Timothy Crowley, M.D., after falling down the stairs a couple of days prior. T474. This was the first in a series of falls he had over the course of the year, which Beckwith largely attributed to his psychotropic medications. *See* T474, 402, 520, 420, 497. Several physicians, however, suspected that alcohol, or alcohol mixed with his medications, was the primary cause of the falls. *See* T893, 426. Beckwith was evaluated by a podiatrist for a foot fracture, T472-73, and eventually had knee surgery, *see* T464. Before the knee surgery, he underwent a mental examination and was found to have normal neurological function and medically stable to undergo surgery. T466-67.

In mid-February 2017, Beckwith went to Dr. Egger for follow-up. T329. He explained that he was not doing well and was feeling very anxious, fretful, worried and not sleeping well. T330. Beckwith also described problems

- 4 -

resulting from alcohol abuse, "which [had] been a problem on and off for many years." T330. Egger noted that Beckwith's basic mental functioning was normal, but that his progress was moderately worse. *See* T330.

On April 4, 2017 Beckwith saw Dr. Egger "on [an] emergency basis with a very tortuous confusing history." T332 According to Beckwith, he needed to go to New York on business after his knee surgery and was supposed to be taking oxycodone for pain. T332. But he said that before he left, his wife got mad and threw away the oxycodone, so Beckwith drank heavily on the trip instead. T332. When he got back from the trip, Beckwith said he was referred to an inpatient alcohol treatment facility in South Dakota. T332. He went to treatment for three days, but claimed he left because there were bed bugs and it was dirty. T332-33.

Beckwith's visit with Dr. Egger was the day after his return from treatment. T333. Egger explained that he believed Beckwith needed inpatient alcohol abuse treatment, but Beckwith did not want to go because he was "about to take a new consulting job." T333. Instead, Beckwith asked for Antabuse to help with his alcohol abuse, along with Valium for sleep and anxiety. T333. Beckwith said he had not taken the naltrexone (another alcohol abuse medication) or Klonopin (an anti-anxiety medication) that had previously been prescribed. T333. Egger noted that Beckwith looked "very tired, foggy and poorly groomed," and that he hoped after some outpatient appointments, Beckwith might agree to inpatient care. T333. Egger also recorded progress of "moderately worse." T333.

Beckwith returned to see Dr. Egger on April 20, 2017 for follow-up. T335. Beckwith claimed to not be drinking, except for five drinks one weeknight prior to the appointment. T335. He had taken the Antabuse as prescribed, but it didn't make him ill when he drank. T335. Beckwith also said he was consulting

with a chemical dependency counselor and was supposed to be attending AA meetings, but hadn't gone. T335. And Beckwith explained that he hadn't gotten the consulting job because he was "too aggressive." T335. Egger noted that Beckwith looked "rather tired, haggard, [and] poorly groomed," and that he looked "almost hungover." T335. Beckwith also complained of severe anxiety and Egger noted that he looked very anxious and ill at ease. T335. But Beckwith claimed he never really took the Valium before bed as prescribed. T335. According to Egger, Beckwith's progress was "minimally improved." T336.

On May 2, 2017 Beckwith saw his primary care doctor, Dr. Crowley, complaining of nausea and vomiting. T460. Beckwith had stopped taking his depression and bipolar medication as prescribed by Dr. Egger and told Crowley that he had just returned from a rehab facility for drinking. T460-61. During the physical exam, Crowley noted that Beckwith appeared anxious, cooperative, depressed, fatigued, ill-appearing, and restless. T461. Crowley adjusted Beckwith's medications, but warned him that abruptly stopping his depression and bipolar medications would likely cause withdrawal symptoms. T462. And he warned Beckwith to not mix some of his medication with alcohol. T462. Crowley also spoke with Dr. Egger, who cautioned against prescribing lithium to Beckwith because of his history of alcohol abuse. T462.

A week later, Dr. Crowley saw Beckwith for follow-up medication monitoring. T455. Beckwith did not report any dizziness, nausea, vomiting, or abdominal pain, and said he felt well, with only minor complaints. T457. The office staff, however, said that Beckwith appeared drunk, and could not walk a straight line when he checked in. T455. During the physical exam, Crowley noted that Beckwith was still anxious, cooperative, depressed, fatigued, ill-appearing, and restless. T456. Crowley recommended that Beckwith return to

see Dr. Egger and follow his recommendations, because he agreed with Egger that Beckwith was bipolar. T457.

On May 16, 2017 Beckwith requested that Crowley prescribe 3 days' worth of Valium until he could see Dr. Egger. T453. And on May 19, Beckwith did have an appointment with Egger where he was "doing very poorly." T338. Egger reported that Beckwith was overusing the benzodiazepines he had prescribed and that he also confronted Beckwith about his drinking. T338. Beckwith admitted to drinking at least two beers per day and not following through with appointments with his substance abuse counselor. T338. Egger also suspected Beckwith was mildly under the influence of alcohol at the appointment. T338. Beckwith showed no psychotic symptoms, tremor, or restlessness, and had normal memory function, concentration and attention span. T338. Egger noted that Beckwith had tapered off all of his psych medications for fear of liver disease. T338. But Beckwith requested more benzodiazepines which he claimed to have lost or thrown away. T338. Egger offered him 1 week's worth to taper him off, but Beckwith "was not at all happy about that." T338.

Beckwith saw Dr. Crowley again on May 30, 2017 for medication monitoring, and reported he had "fired his psychiatrist," because his medications did not work for him. T451. According to Beckwith, the medications caused stomach upset and vomiting. *See* T451. Beckwith also claimed that he had not been drinking as regularly because of his stressful job. T451. Crowley observed that Beckwith was in denial about his bipolar disorder and non-complaint with medications. T451. He also noted that Beckwith was "very agitated today and [] very anxious and demanding something to help him relax immediately." T452. Crowley prescribed both Zoloft and Valium, but told Beckwith that Valium was an addictive drug that should not be mixed with

alcohol and prescribed just enough to get through until he could see another psychiatrist for medication management. T452.

On June 29, 2017 Beckwith saw psychiatrist Michael Coy, M.D. for the first time. T504. Beckwith told Coy that he had been misdiagnosed as bipolar and the medications he was prescribed never worked. *See* T504. He described his symptoms as depressed mood, poor sleep, anxiety, poor appetite, poor energy/motivation/interests and constant worry. T504. Beckwith said that the Zoloft and Valium Dr. Crowley had prescribed were helping and he was sleeping much better, but he was still depressed and worrying. T504. According to Beckwith, he was drinking 1-2 beers per night several nights per week, but Beckwith reported to Coy that he had no history of alcohol abuse treatment. T504-05. Coy's physical exam was unremarkable and reflected normal affect, thought processes, thought content, insight, judgment and memory. *See* T506-07. Coy also noted that Beckwith was a "excellent historian." T504. Beckwith was diagnosed with generalized anxiety disorder and major depressive episode, recurrent episode, moderate. T509. Coy increased the amount of Zoloft Beckwith was taking, continued the Valium, and noted "he could benefit from individual psychotherapy." T509.

July 4, 2017 brought Beckwith to the emergency room following a fall in his shower that injured his chest and shoulder. T893. Beckwith thought he passed out from an increased dose of Zoloft, but medical providers suspected alcohol and drug use as a potential cause of the fall. T893. Beckwith admitted to drinking daily and expressed an unwillingness to stop, so Zoloft was discontinued. T346. They also noted that while Beckwith's thought content was normal, his speech was delayed, he was slowed, and he exhibited a depressed mood. T896. Beckwith was eventually admitted to the hospital and then transferred to an occupational therapy facility for several days. *See* T411-13;

T915-18. Occupational therapists at the facility noted that Beckwith presented with impaired safety awareness and judgment and had a flat affect. T917, 919. Other providers at the facility noted, however, that Beckwith did not exhibit depression or sleep issues, T829, was not agitated, T833, and had normal psychosocial functioning. T841-42.

Shortly after being discharged from rehabilitation, Beckwith saw Dr. Coy and complained that the increase in Zoloft caused his fall, so he'd quit taking it. T512. Beckwith told Coy that he was taking the Valium, because it was the only thing that helped him sleep, and that he rarely drank—only 1-2 times per month. T512. Beckwith also explained that his 85-year-old mother had started bringing him prepared meals. T512. Coy's physical exam was again unremarkable. *See* T515. Ultimately, Coy continued Beckwith on Valium and reviewed some relaxation and breathing techniques. T517-18.

On August 4, 2017, Beckwith went to the emergency room again, complaining of rib pain. T353. After waiting for 2 hours, he told emergency department staff that he was suicidal and wanted to shoot himself. T353. A physical exam found Beckwith to be in no acute distress, to have normal orientation, and to be cooperative. T355. Urinalysis revealed a high level of alcohol. T355, 358. The ER called a behavioral health specialist, but then Beckwith denied any suicidal ideation and said he was most worried about his anxiety. T355.

Beckwith saw Dr. Crowley a few days after going to the emergency room and said he was very depressed and had contemplated suicide. T444. He told Crowley that he was talking to his priest for therapy and that the Zoloft wasn't working. T444. Crowley's physical exam noted that Beckwith was cooperative and alert, but slurring his words. T445. Crowley documented that Beckwith was in denial, non-compliant with medications for both bipolar and alcohol

abuse, had showed up to his appointment intoxicated and smelling of alcohol, and took two long phone calls during the visit. T446. Crowley recommended Beckwith go to a reputable alcohol inpatient treatment program and that it was imperative that he stop drinking if he was to live because he was "spiraling downward very rapidly." T446.

Two days later, on August 9, Beckwith had an appointment with Dr. Coy. T520. Beckwith was scheduled for medication management, but also told Coy that he fell out of his car and injured his ribs. T520. Beckwith did not believe that the falls were related to the combination of Valium and Oxycodone, and Coy reviewed the problem with mixing those medications. T520. Beckwith explained that Valium was the only thing helping him sleep and he sometimes took it three times per day. T520. He also denied drinking any alcohol and said his appetite was good because his mother was still bringing him meals. T520. Again, Coy's physical exam was unremarkable. T523. Coy told Beckwith to continue with the Zoloft and increased his Valium to three times per day.[3] T525.

On August 17, 2017, Beckwith returned to the ER saying he fell on the stairs and had rib pain. T420. The providers suspected that Beckwith's recurring falls were related to alcohol abuse and its interaction with Beckwith's medications. *See* T426. Beckwith had slurred speech and his urine was positive for alcohol. T422-23. He admitted to drinking about 2 beers per

---

[3] It appears that Dr. Coy would only update certain portions of Beckwith's medical records each subsequent visit. For example, the phrase "excellent historian," appears throughout the records in the same place as it originally appears on the first visit. *See, e.g.*, T504, 512, 520. In addition, "he could benefit from individual psychotherapy," also appears in the treatment plan, but it's not clear until later in the records how much Coy is encouraging therapy. *Compare* T509, 517, 525, *with* T719, 730, 748, 757.

day. T420. Beckwith also reported he was depressed because he was going through a divorce. T424. Providers performed a chest x-ray and CT scan, which were both negative, and Beckwith was discharged. T420. However, while waiting for a taxi, he fell again in the parking lot and was admitted to the hospital. T420.

Beckwith went to see Dr. Coy again on August 23 for medication management. T528. He told Coy he fell again and that the ER told him to see a neurologist.[4] According to Beckwith he stopped taking his Valium and pain medications and was not drinking alcohol. T528. Coy discussed the benefit of psychotherapy but noted that Beckwith was not interested because he was "talking to his priest frequently." T528, 533. Coy noted that Beckwith's mood was "stable," and so continued his Zoloft prescription but did not re-order Valium. T533.

The next day, Beckwith saw Dr. Crowley for follow-up after his fall and ER visit. T439. Beckwith said that he was managing his rib pain, but still experiencing depression and dizziness. T439. And he was still having difficulty sleeping. T439. Beckwith also reported vomiting and abdominal pain from NSAIDs and an anticonvulsant he was taking for his ribs. *See* T439. Crowley's physical exam showed normal behavior and mental function and he noted that Beckwith was "more compose[d] today and seems sober." T440.

The following day, Beckwith saw an ear, nose, and throat specialist for possible inner ear issues related to his falls. T497. Beckwith reported having 2 drinks per day and complained of diarrhea, but not vomiting. T498. He also reported having depression, but not anxiety. T498.

---

[4] The discharge summary confirms that the hospital did suggest he follow up with neurology if falls persisted, but also told him to "cut down on his drinking." T426.

On December 7, 2017, Beckwith returned to see Dr. Coy for medication management. T536. He told Coy that he was trying to get on disability. T536. According to Beckwith he was doing better, and had not been falling, but was still anxious, depressed, and having sleep problems. T536. He attributed his depression to his divorce, which was to be final in a month. T536. Coy encouraged psychotherapy, but Beckwith said he was still not interested because he was talking to his priest regularly. T536, 542. Beckwith again denied drinking alcohol. T536. Coy's physical exam noted that Beckwith's mood was sad/depressed and anxious and that his affect was flat/blunted. T539. Coy adjusted Beckwith's medications and wanted to see him in a month. T542.

Coy saw Beckwith again on January 4, 2018, and he reported increased stress, anxiety and sleep problems. T659. Beckwith said his divorce could be final in a couple of weeks, and that he was going to have to move his father to a nursing home. T659. Beckwith also explained that nothing other than Valium had helped with his sleep problems. T659. Coy explained that the Valium could have contributed to his falls. T659. Beckwith did report he was drinking 1-2 beers per week and Coy reiterated that alcohol could contribute to his mood fluctuations and interact with his medication. T659. Beckwith also refused therapy because he said he was still talking to his priest. T659. Coy's physical exam documented cooperative behavior, good eye contact, and normal psychomotor activity and speech. T662. However, he also documented a sad/depressed and anxious mood as well as a restricted range of affect. T662. Coy adjusted his medications, in part because Beckwith had stopped taking one of them. T664.

Beckwith saw Coy again at the end of January complaining of stress and an inability to sleep. T667. He attributed the stress to his dad being placed in

a nursing home and concerns about his mother's health. T667. Beckwith also said he had stopped drinking "a month ago," and was still not interested in therapy. T667. And Beckwith said he stopped taking his Ativan because it wasn't helping. T667. Coy's physical exam noted no changes since Beckwith's last visit. *See* T670. Coy adjusted Beckwith's medications, and Beckwith agreed to "no alcohol." T672.

James Wax, M.D., an agency medical examiner, saw Beckwith on or about February 1, 2018.[5] T544. According to Wax, Beckwith was there "basically because of bipolar disorder, which so far has not been responding well to medications." T544.[6] Beckwith said he was taking Zoloft, Buspar, and other medications but he couldn't remember them all. T544. He also told Wax that he drank 2 beers per week and used sleep aids, which had not been helpful. T544. Finally, Beckwith complained of weight loss and significant memory loss. T545. Wax's physical exam noted that Beckwith was friendly and talkative, but that he "demonstrate[d] some anxiety and it was somewhat difficult to keep him on track. T545. And according to Wax, Beckwith was anxious and talkative, but not forgetful. T546. Wax ultimately concluded that Beckwith had bipolar disorder and lumbar disc disease. *See* T546.

On February 1, 2018 Beckwith also saw Dr. Coy and told him that Wax said he had bipolar disorder. T676. Beckwith reminded Coy that Dr. Egger had diagnosed him with bipolar, but that he had not wanted to be on those

---

[5] The date of examination is not in the record. *See* T544. However, Wax's notes were dictated on February 1, 2018 and the report appears to have been filed on February 2, 2018. *See* T544.

[6] Beckwith told Wax that he was bipolar and had a family history of bipolar, but up to this point, nothing in Dr. Coy's records reflect that Beckwith had told him the same information. *See* T544, 669-72.

medications again. T676. And Beckwith said he was still not interested in therapy, and that he had stopped drinking over a month earlier. T676. However, Coy discussed with Beckwith that an employee at his office thought Beckwith was drunk when he called the previous week to say he was still not sleeping and "trying to get into his parent's home vault to check on the gold."[7] T676. Coy had Beckwith agree to no alcohol consumption. T681. Coy's physical exam noted that Beckwith was fidgety, and his speech was rapid, but not pressured. T679. Beckwith's mood was sad/depressed and anxious, and his affect was also anxious. T679. Coy decided to have Beckwith sign a release for Egger's and Wax's records to help further evaluate for bipolar. T681. Coy also adjusted Beckwith's medications, again in part because Beckwith had stopped taking one of them, and re-prescribed Ativan, which Coy was monitoring carefully. T677, 681.

In mid-February Beckwith returned to see Dr. Coy and told him he was still stressed and could not sleep. T685. Beckwith was convinced he needed a sleep study, because his brother had sleep apnea. *See* T676, 685. He also reported that he was now living with his mother. T685. Coy's physical exam findings were the same as Beckwith's last visit—fidgety and anxious, but with many normal findings. *See* T688, 679. Coy increased Beckwith's medication dosages. T690-91. He also noted that Beckwith declined therapy and agreed to no alcohol. T690-91.

On February 22, 2018, Beckwith saw Dr. Coy again and Coy "had to confront him with overusing the Ativan." T694. Beckwith had attempted to

---

[7] According to Beckwith, his brother had been trying to get into the vault to inventory some gold coins his parents had collected, and his cousin, a retired judge, had to intervene and make he and his mother guardians of her estate because the brother had negative intentions. T676.

refill his prescription early, but Coy refused the pharmacy request, cancelled the Ativan, and ordered Klonopin instead. T694. Beckwith said that the Klonopin had worked the night before and agreed to follow Coy's directions. T694. Coy's physical exam noted that Beckwith's speech was normal, but his affect was restricted. T697. Coy told Beckwith to come back in a week. T700-01.

Beckwith saw Dr. Coy again on March 1, 2018.[8] He complained that he was anxious and that the "old meds" were better because the Klonopin was not helpful. *See* T703. Beckwith also expressed reluctance to take bipolar medications, especially Depakote, because he thought it may have caused liver problems. *See* T703. He also said that while he had previously stopped drinking, now that he was living with his mother, he would have 1 beer while watching sports. *See* T703. Coy's physical exam notes were unchanged from the previous visit. *See* T706, 697. Coy adjusted Beckwith's medications and noted that Beckwith understood he should not be drinking alcohol. T710.

On March 15, Beckwith was back in Dr. Coy's office complaining of anxiety and road rage. T712. He said he tried to get a job as a car salesman, but they didn't hire him because he was taking Klonopin. T712. Beckwith was still drinking a beer with his mother when watching college basketball, and Coy reiterated why alcohol was a problem when taking psych medications. T712. Coy's physical exam notes were unchanged. T715, 706. Coy continued Beckwith's medications as prescribed but increased the Klonopin. T719. He also noted that Beckwith was "willing to consider a therapist at our next visit." T719. He also said that if Beckwith took "his meds faithfully," he would extend their visits to monthly. T719.

---

[8] The record for this visit appears to have been folded when scanned, which obscures most of the relevant notes. *See* T703.

At the end of March, Beckwith followed up with Dr. Coy and told him he thought he needed to be on lithium. T721. Beckwith complained of mood instability, and said he remembered times of significant mood fluctuations with periods where he did not require much sleep. T721. Beckwith also said he'd fallen down the stairs again, been turned down for Social Security, and been anxious. T721. Beckwith "wanted to get a job in cyber security, but state[d] he [was] unable to work." T721. Coy's physical exam reflected that Beckwith was both irritable and moody in addition to his typical sad/depressed and anxious mood. *See* T724, 715. In addition, Coy officially diagnosed Beckwith as having bipolar disorder 1, unspecified. T726.

On April 3, 2018 Beckwith returned to see Coy and said, "I am sure that I have been bipolar for 12 years or longer." T730. Beckwith said he wanted to be on lithium due to mood instability, noting that Dr. Egger and his ex-wife both pointed it out to him. T730. Beckwith still wasn't interested in therapy, but agreed to stop drinking alcohol if Coy started him on lithium. T730. Coy's physical exam notes were unchanged since Beckwith's last visit. *See* T733, 724. And Coy continued Beckwith's prescriptions while also starting him on lithium. T737.

Coy saw Beckwith again on April 12, and Beckwith complained of ongoing mood swings, panic, sleeping problems and anxiety. T739. Beckwith was consistently taking his medications but had seen little to no improvement. *See* T739. He was also still living with his mother who helped with "structure and supervision." T739. Beckwith continued to "obsess, dwell, and ruminate," about his past poor investments, divorce, and bankruptcy, which caused "great anxiety and panic." T739. Coy said that after reviewing his history and disability paperwork he agreed Beckwith had bipolar disorder, panic disorder, generalized anxiety disorder and perhaps even OCD. T739. Coy's physical

exam noted that Beckwith had elevated psychomotor activity and his speech was rapid and pressured. T742. He also observed Beckwith's mood to be depressed, anxious, irritable and moody, with a congruent affect. T742. Coy noted that Beckwith's thought process was goal-directed, organized and logical, but that he sometimes displayed flight of ideas. T742. Beckwith also exhibited both inflated confidence and poor confidence as well as obsessions/compulsions, impaired judgment, and poor impulse control. T742. Coy increased Beckwith's lithium and wanted to see him back in a week. T746.

When Beckwith returned to Dr. Coy on April 25, he was in a lot of pain due to a car accident on April 17. T748. He had called the after-hours number over the weekend due to pain and Coy referred him to the emergency room. T748. Beckwith said he was taking his medications consistently, but Coy noted that he was going through his Klonopin too quickly and that was a problem. T748. Beckwith complained that he was still having mood swings, panic, sleep trouble and obsessive thoughts. T748. Coy "insisted that he attend psychotherapy as he need[ed] to learn non-medication ways to deal with anxiety and stress." T748. And Coy's physical exam was largely unchanged since the last visit. *See* T751, 742. Coy limited Beckwith's Klonopin, and noted that Beckwith had finally agreed to therapy. T755.

On May 9, 2018, Beckwith followed-up with Coy and reported he was under stress related to his mother's health problems, and still having mood swings, panic and sleep problems. T757. Beckwith was taking his medications consistently, but had again gone through his Klonopin too quickly and Coy decided to taper him off completely. T757. Coy also recommended therapy again, as Beckwith had not made an appointment. T757. Beckwith reported he hadn't been drinking since starting the lithium in April. *See* T757. According to Coy, Beckwith exhibited intermittent eye contact, had ADD-like thought

process, and "tend[ed] to repeat the same story." T760. Coy also observed that Beckwith's insight and judgment were "fair." T760. Coy started Beckwith on Gabapentin for sleep, provided some individual psychotherapy including reviewing coping skills and problem solving, and recommended increased physical activity and added activity to structure his day and distract from anxiety. T763-64.

Beckwith returned to Coy's office a week later and was still stressed, in pain, and having mood swings, panic, and sleep problems. T767. Beckwith was complying with his medications but asked about Klonopin, which Coy explained "numerous times" Beckwith needed to stop because he was "taking too much." T767. Beckwith also had started therapy. T767. Coy observed that Beckwith's affect was in a restricted range—otherwise, his physical exam was the same as the previous week. *See* T770, 760. Coy wanted to see Beckwith back in 2-3 weeks. T774.

On May 17, 2018 Beckwith went to the ER complaining of abdominal pain he thought might be related to his car accident. T610. He told the ER doctor that he also had nausea and decreased appetite. T610. Beckwith reported he drank beer the previous night and typically had about one drink per week. T610. The ER doctor observed Beckwith to be in no acute distress, conversant, alert and oriented. T611. He ran labs and found nothing unusual and no alcohol in Beckwith's system, and concluded there was no clear reason for his abdominal pain. T614. The doctor also noted that Beckwith "requested to leave on multiple occasions throughout his emergency room stay." T615.

At the end of May, Beckwith saw Dr. Coy again and was very upset he could not get any pain medication. T777. Beckwith said "[n]o one cares that I am in pain," and "everyone's treating me like I'm a drug addict." T777. Coy tried to work with Beckwith on his "distorted thought," but Beckwith refused.

T777. Beckwith also claimed to have stopped all of his psychotropic medications because they were bothering his stomach, but then started Zoloft again because his stomach problems continued. T777. Coy noted that Beckwith had cancelled his therapy appointment and was "back and forth" about taking Zoloft. T777. And Beckwith "adamantly denie[d] drinking any alcohol." T777. Coy observed that Beckwith was uncooperative, had intermittent eye contact, and was loud and irritable. T780. According to Coy, Beckwith also had inflated confidence, obsessions, ruminations, and impaired judgment and insight. T780. Coy's treatment plan said "[n]o meds prescribed by me. Not for sure if he will be returning as he left my office without scheduling an appointment with me or [his therapist]. He was not suicidal, homicidal or psychotic." T782-83.

Throughout the month of June 2018, Beckwith saw several providers and made a trip to the ER complaining of inconsistent symptoms,[9] including severe abdominal pain, nausea, weight loss, vomiting, and other gastrointestinal distress. *See* T598-608, 624-31. During these medical visits, Beckwith was observed to be in no acute distress, oriented, and have normal mood and affect. *See* T600, 604, 625-27. One provider noted that Beckwith was "anxious appearing." T605. While at the ER, Beckwith got an abdominal x-ray and other labs that were unremarkable. *See* T602, T627-29. Nevertheless, Beckwith told another provider at a follow-up office visit that he had stomach ulcers and needed to have an endoscopy soon. *See* T602. At the same office visit, Beckwith said he had stopped taking the medications previously prescribed for his gastrointestinal symptoms. T602, 605. And Beckwith said that he had "recently fired his primary care provider after a misdiagnosis and refusal to

---

[9] Sometimes Beckwith would complain of weight loss, T598, but other times he denied weight loss. T602. And Beckwith also both told providers that he had vomiting, nausea and diarrhea, *see* T598, 602, and that he did *not* have those symptoms, *see* T624.

prescribe pain medication," and that he had plans to go to urgent care for "a muscle relaxant today." T602. On June 21, 2018, Beckwith had an upper GI endoscopy that revealed diffuse, mild inflammation of the stomach consistent with moderate chronic inactive gastritis. T606-08.

Beckwith also saw Dr. Coy twice that month—on June 20 and 26—primarily complaining of pain and that no one, including Coy, would prescribe him pain medication. *See* T786, T795. He also told Coy that he wasn't taking any of his psychotropic medications because of his stomach. T786, 795. At the first visit, Coy decided not to prescribe any medications until the endoscopy was complete and Beckwith provided him with the results and recommendations from the GI specialists. T791. Coy also told Beckwith he needed to continue therapy and performed some supportive psychotherapy techniques and cognitive behavioral therapy. T792.

At the second visit, Coy had to confront Beckwith about calling the after-hours line the night before and demanding anti-anxiety medication (Xanax) and pain medication, and when Coy refused, telling Coy he was suicidal. T795. Coy noted that Beckwith was being "very irrational" on the phone and Coy had to tell him that he would have to call 911. T795. Beckwith responded by saying "well, don't call them tonight because I will wait to kill myself tomorrow." T795. Coy called 911, but when 911 tried to make contact with Beckwith he would not answer his phone and was not at home. T795. Beckwith then called Coy back, but by the time Coy answered, Beckwith had hung up, forcing Coy to call 911 again. T795.

In the office that day, Beckwith still demanded that Coy prescribe Xanax and pain medication, and said "urgent care gave me three days' supply of Xanax and said that was enough to get me through until I saw you so that you would continue the prescription." T795. Coy "discussed with [Beckwith] that

due to his complex case, [he] would be recommending an agency (*i.e.* CHI) that has higher levels of care to address his needs," including intensive outpatient treatment, inpatient treatment, or partial hospitalization. T796. When Coy gave Beckwith his discharge letter, Beckwith "became upset, tossed the letter down to the floor and stormed out of [his] office past patients in the lobby." T796.

On July 2, 2018 Beckwith was back in the ER complaining of severe abdominal pain and medication withdrawal. T632. He told the nurse that he was not eating or sleeping and that his psychiatrist had "fired him as a patient." T632. He also said, "everything is wrong with me," and that he had been trying to take his GI medications since his endoscopy but hadn't been taking any other medications. T632. And he said his symptoms included vomiting, nausea, diarrhea, anxiety, a racing heart, and some headaches. T632. Beckwith admitted to drinking 1-2 beers daily, but said he couldn't hold anything down. T632. According to the nurse, Beckwith appeared distressed and anxious with increased bowel sounds and diffuse abdominal tenderness. T635. But a CT scan revealed no acute problems, and Beckwith's drug and alcohol screens were negative. T636-37. Beckwith was admitted and told doctors the same thing he'd told the ER nurse. *See* T642-44. One doctor observed that Beckwith's speech was "a bit pressured," his behavior was "a bit strange" with ideas of grandeur, and his mood was depressed/anxious. T644. Doctors suspected "most of his symptoms [were] related to anxiety and (now) untreated bipolar disorder." T646.

On July 26, 2018 Beckwith had his first visit with George Hutfless, M.D., who took over Beckwith's primary care and psychological care. *See* T945. Hutfless took a thorough history, and Beckwith said he had trouble with racing thoughts and getting to sleep and had been diagnosed as bipolar. *See* T946.

Beckwith said he had received a "short course," of Xanax from another doctor and wanted more because it had helped with his symptoms. *See* T946. Beckwith said the previous psychiatrists he'd seen had prescribed lots of medication, but that none ever really helped, and he blamed his abdominal pain on the medications. T946. And he reported drinking 1-2 beers several times a week while watching sports. T946. Hutfless observed that Beckwith had mild pressure of speech and was not sedated or despondent. T947. Hutfless prescribed Xanax for the short term, but explained to Beckwith that he needed to "establish care with a mental health specialist." T947. And he also prescribed lithium, Zoloft, and Gabapentin for Beckwith to start. T947. Notably, Beckwith's mother was present at the visit and was "aware of [the] plans." T947.

One month later, Beckwith returned to see Hutfless, saying that the Xanax had helped, but he was still not able to sleep for 4 or 5 days at a time and would then "crash." *See* T950. Beckwith claimed that, as a result, he was fired from a job as a surveyor's assistant. T950. Hutfless emphasized that Beckwith needed to see a mental health specialist, and due to his financial limitations, they looked at need-based providers. T950. Beckwith agreed to go to the Douglas County Health Center after Hutfless called and got instruction on how and when to go. *See* T950-51. Hutfless also continued Beckwith's prescriptions, including Xanax. T950-51.

Beckwith followed-up with Hutfless again toward the end of September 2018 and Hutfless noted he "seem[ed] to be coping fairly well." T953. Beckwith complained primarily of wrist pain. T953. He also told Hutfless that he did not make an appointment with the Douglas County mental health providers because when he went there was a long line that turned him off. T953. Hutfless reemphasized that Xanax was not an appropriate long-term treatment for

bipolar disorder and Beckwith needed to see a mental health specialist. T953. He also observed that Beckwith's speech was not pressured, and he was not sedated or despondent. T955. Hutfless agreed to continue Beckwith's Xanax "for now." T955.

### 3. OPINIONS

In addition to Dr. Wax, who medically examined Beckwith in February 2018, Glenda Cottam, Ph.D., J.D., reviewed Beckwith's records on March 11, 2018 and issued a report for the agency. *See* T551-56. Cottam concluded that Beckwith's impairments were not severe. T551. Cottam also concluded that the evidence of record at the time did not meet or equal *any* mental health listing, including depression and generalized anxiety disorder. *See* T554, 556, 566. Cottam said she reviewed all of the medical records from Dr. Egger, the records from Dr. Coy through December 7, 2017, and the records from other non-mental health providers. *See* T565. Cottam's opinion "carefully considered" all mental health listings, but "especially" depression and generalized anxiety. According to Cottam, the evidence of record showed that Beckwith "had problems with alcohol use" but she noted Beckwith had never been in treatment, been to therapy or been psychiatrically hospitalized. T566. She also relied on the fact that Beckwith was college-educated, intelligent, formerly financially successful, and had no memory problems. T566. And she said he could live alone, drive a car, read and "engage in other activity that requires some focus," socialize, and handle his own money.  T566. So, she concluded that "he could have some mild mental health limitations," but marked limitations were not supported by the record. T566.

On June 7, 2018 several individuals conducted a reconsideration of Beckwith's claim and mental health limitations. *See* T75-86. Upon reconsideration, the agency personnel, including an M.D. and Ph.D., concluded

that Beckwith's symptoms were "major depression and inability to sleep," but that those symptoms were not as severe as he claimed and did not result in marked limitations in any of the four broad areas of functioning. T81-82. Notably, at the reconsideration stage, Beckwith's bipolar disorder and anxiety disorder were categorized as severe. T80-81. But the reviewers still determined that Beckwith could perform his past relevant work as an investment banker. T85-86.

In support of his application for disability, Beckwith submitted treating source statements from two physicians, Dr. Coy and Dr. Hutfless.[10] *See* T590-94, 966-70.

Dr. Coy opined that Beckwith's prognosis was poor and that he was therefore unable to work due to his bipolar disorder, generalized anxiety disorder, and panic disorder.[11] T590, 594. Coy pointed to clinical findings of racing thoughts, poor sleep, impulsive mood, instability, flight of ideas, poor concentration, poor judgment, intense anxiety, irritability, always feeling on edge, titrating upward on lithium, and always spending money. T590. In the four broad areas of functioning relevant to a finding of disability from mental illness, Coy thought Beckwith was either extremely limited or markedly limited, except long-term memory, where Coy opined he was only moderately limited. T592-93. In Coy's opinion, Beckwith could also not maintain

---

[10] A mental capacity assessment is included in the record from what appears to be a third physician. *See* T494-96. However, the signature is illegible and the printed name is for the claimant, Beckwith, and not the provider. T496. So, the court will not rely on it for purposes of this opinion because it cannot be compared to the provider's treatment records.

[11] Dr. Coy completed this treating source statement on April 12, 2018, before Beckwith's symptoms got progressively worse and Coy recommended he seek more comprehensive treatment. *See* T796.

concentration longer than 5 minutes and would regularly miss work. T593. Finally, Coy opined that Beckwith would not be able to maintain appropriate social interaction. T593-94.

Dr. Hutfless's opinion was generally consistent with Coy's. *See* T966, T969-70. According to Hutfless, the clinical findings of poor concentration, racing thoughts, sleep difficulties, limited attention and pain supported his opinion. T966. In the four broad areas of functioning, Hutfless opined that Beckwith was either extremely or markedly limited in most areas. T968-70. And to support those opinions, Hutfless reference evidence that Beckwith could not remember specifics of a legal order, had difficulty maintaining relationships with family, had intrusive thoughts, and had forgotten to make daily phone calls required by the court. *See* T968-69.

### 4. ADMINISTRATIVE HEARING

At the time of the administrative hearing on November 27, 2018, Beckwith testified more or less consistently with his medical records. *See* T41-43, 46-48, 51-52, 54-57, 59. Beckwith described himself as bipolar, T43, with severe trouble sleeping, T52, a tendency to "overdo everything," T54, panic attacks, T60, and concerns that the psych medications he was taking destroyed his stomach, T41.

It is also evident from the transcript that Beckwith was difficult to keep on topic, even for the ALJ. *See* T43, 46-49, 50-52. When the ALJ asked Beckwith why he felt he couldn't work, they had the following exchange:

> A: I attempted with—like I said, I had over 24 interviews and no one would hire me because they thought I was—there was something wrong with me.

Q:  Well, did you think you could work?

A:   I always think I can work. I'm an achiever, I'm an over-achiever, I'm a three-time all American swimmer. I paid my way through college. I paid my way through life.

Q:  Well, if you don't think you're disabled, why are you here?

A:  No one will hire me because I don't—I go five days with no sleep and then everybody thinks I'm halfway nuts because I get into my manic stage. And do I take confrontation well? No, I don't. I tend to overreact. Of those—and this happens week after week. Two days I am completely out of it, which means all I can do is lay around and sleep for two days, and then I'm up five days straight. Three workouts a day in high school. I never partied. I never did drugs.

Q: Yeah, we're talking about now, Mr. Beckwith.

. . .

Q: . . . [B]ecause of your bipolar [] there are days when you can't work. Is that right?

A: Without a doubt. And the days that I do work, I'm well, most people consider me manic, which means I overdo everything.

. . .

Q: . . . Physically, now, physically, could you work?

A: I want to work, and I still try interviews. Nobody will hire me.

Q: No, that's not my question. Please listen. Do you think that physically you could work at a job?

A: I'm not sure. If nobody's going to hire me, does anybody have any confidence in me? I don't know—

Q: That's beside the point.

A: Okay.

Q: We're not talking about—

A: I want to work, yes.

Q: Do you think physically you could work?

A: I believe so, to a limit. Granted, it's going to hurt like hell, but I'll do it. But I'm used to pain.

T52-55.

Beckwith was also on five different medications at the time of the hearing: Xanax four times per day, Topiramate (an anti-convulsant) once per day, Hydrocodone/Acetaminophen four times per day, and a Transderm-Scop patch for nausea. *See* T57-59, T297. When asked about going off his medications in the past, Beckwith testified he had gone to the ER several times with stomach pain and vomiting, and that the psych meds were causing his symptoms. *See* T63-64.

Beckwith also described limited activities of daily life. *See* T59-62. Beckwith was still living with his mother, who did the grocery shopping, cooked and cleaned. *See* T59-60, 62. Beckwith also said he didn't have any friends— they had all died, and he didn't talk to his siblings or get along with other people. *See* T60-61. And Beckwith testified that he is prone to confrontation and overreacting, which he thought would be a problem in a work setting. *See* T60-61. Finally, he said sometimes he can't figure out where he is when driving and has to plan ahead and know exactly where he is going. T62.

In addition to testimony from Beckwith, the ALJ heard testimony from a vocational expert (VE). The VE described Beckwith's past relevant work as a securities or investment analyst, which is sedentary, highly skilled work. T66, 69. The ALJ presented the VE with a hypothetical regarding whether an individual of the same age, education, past work history, both as to exertional

level and skill level, who within an eight-hour day could lift 20 pounds occasionally, 10 pounds frequently, stand and walk for six hours, sit six hours with normal breaks, complete an eight hour workday, and could occasionally climb stairs, ladders, balance, stoop, kneel, crouch and crawl, but should avoid concentrated exposure to wetness, vibration and hazards could perform Beckwith's past relevant work. T67-68. The VE opined that such an individual could. T68.

The ALJ then asked the VE a second hypothetical: whether in addition to the limitations in hypothetical one, if an individual, due to his mental health, would be off task 25 percent of the time and miss four days of work per month, would there be any type of competitive employment the individual could do? T68. The VE opined that, in his experience and knowledge in the field of vocational rehabilitation, such an individual could not obtain competitive employment. T68.

## III. SEQUENTIAL ANALYSIS AND ALJ FINDINGS

Beckwith claimed he was disabled as a result of bipolar disorder, knee injury, broken bones, and back injury, and had been since February 2, 2016. T185. To determine whether a claimant is entitled to disability benefits, the ALJ performs a five-step sequential analysis. 20 C.F.R. § 416.920(a)(4).

### 1. STEP ONE

At the first step, the claimant has the burden to establish that he has not engaged in substantial gainful activity since his alleged disability onset date. *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006); 20 C.F.R. § 416.920(a)(4)(i). If the claimant has engaged in substantial gainful activity, the claimant will be found not to be disabled; otherwise, the analysis proceeds to step two. *Gonzales*, 465 F.3d at 894.

- 28 -

In this case, the ALJ found that Beckwith had not engaged in substantial gainful activity since August 22, 2017, the date of his protective application for disability benefits. T12.

## 2. STEPS TWO AND THREE

At the second step, the claimant has the burden to prove he has a "medically determinable physical or mental impairment" or combination of impairments that is "severe[,]" 20 C.F.R. § 416.920(a)(4)(ii), in that it "significantly limits his physical or mental ability to perform basic work activities." *Gonzales*, 465 F.3d at 894; *see also Kirby v. Astrue*, 500 F.3d 705, 707–08 (8th Cir. 2007). Next, "at the third step, [if] the claimant shows that his impairment meets or equals a presumptively disabling impairment listed in the regulations, the analysis stops and the claimant is automatically found disabled and is entitled to benefits." *Gonzales*, 465 F.3d at 894; 20 C.F.R. 416.920(a)(4)(iii). Otherwise, the analysis proceeds.

For mental impairments, at steps two and three of the sequential analysis, the ALJ utilizes a two-part "special technique" to evaluate a claimant's impairments and determine, at step two, whether they are severe, and if so, at step three, whether they meet or are equivalent to a "listed mental disorder." 20 C.F.R. § 416.920a(a), (d)(1) and (2). Part one of the special technique requires the ALJ to decide whether the claimant has "medically determinable mental impairment(s),". 20 C.F.R. § 416.920a(b)(1). If any such impairment exists, the ALJ must then rate the degree of "functional limitation" resulting from the impairment (part two). 20 C.F.R. § 416.920a(b)(2). This assessment is a "complex and highly individualized process that requires [the ALJ] to consider multiple issues and all relevant evidence to obtain a longitudinal picture of [the claimant's] overall degree of functional limitation." 20 C.F.R. § 416.920a(c)(1).

Four "broad functional areas" are used to rate these limitations: "[u]nderstand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself." 20 C.F.R. § 416.920a(c)(3). These areas are also referred to as the "paragraph B criteria," which are contained in 20 C.F.R. Part 404, Subpart P, Appx. 1, § 12.00 *et seq*. The criteria are rated using a five-point scale of none, mild, moderate, marked, and extreme. 20 C.F.R. § 416.920a(c)(4).

After rating the degree of functional limitation resulting from any impairments, the ALJ determines the severity of those impairments (step two). 20 C.F.R. § 416.920a(d). Generally, if the four functional areas are rated as "none" or "mild," the ALJ will conclude that any impairments are not severe, unless the evidence indicates more than a minimal limitation to a claimant's ability to do basic work activities. 20 C.F.R. § 416.920a(d)(1). If any impairments are found to be severe at step two, the ALJ proceeds to step three, and compares the medical findings about the impairments and the functional limitation ratings with the criteria listed for each type of mental disorder in 20 C.F.R. Part 404, Subpart P, Appx. 1, § 12.00 *et seq*.

At step two, the ALJ found that Beckwith has the following severe impairments: degenerative disc disease of the cervical and lumbar spines, residuals of rib fractures, residuals of thoracic compression fracture, degenerative joint disease of the bilateral hips, and degenerative joint disease of the right knee. T12. And the ALJ determined that Beckwith's tendinitis of the right wrist did not meet the durational requirements of 20 C.F.R. § 416.909.[12] T13 Finally, the ALJ concluded that Beckwith's bipolar disorder,

---

[12] Unless an impairment is expected to result in death, it must have lasted or be expected to last for a continuous period of at least 12 months. 20 C.F.R. § 416.909.

panic disorder, major depressive disorder and generalized anxiety disorder were medically determinable, but non-severe, because they only resulted in mild limitations in any of the four broad areas of functioning.[13] T13.

At step three, the ALJ found that Beckwith did not have an impairment or combination of impairments that meet or medically equal a presumptively disabling listed impairment. T15. Accordingly, the ALJ proceeded to determining Beckwith's residual functional capacity.

### 3. RESIDUAL FUNCTIONAL CAPACITY

Before moving to step four, the ALJ must determine the claimant's residual functional capacity (RFC), which is used at steps four and five. 20 C.F.R. § 416.920(a)(4)(iv) & (e). "'Residual functional capacity' is defined as 'the most [a claimant] can still do' despite the 'physical and mental limitations that affect what [the claimant] can do in a work setting' and is assessed based on all 'medically determinable impairments,' including those not found to be 'severe.'" Gonzales, 465 F.3d at 894 n.3 (quoting 20 C.F.R. § 416.945).

The ALJ first considers whether the claimant suffers from "medically determinable impairment(s) that could reasonably be expected to produce [the claimant's] symptoms." 20 C.F.R. 416.929(a) to (c)(1)A medically determinable impairment must be demonstrated by medical signs or laboratory evidence. 20 C.F.R. § 416.929(b). If this step is satisfied, the ALJ then evaluates the intensity and persistence of the claimant's symptoms to determine how they limit the claimant's ability to work. 20 C.F.R. § 416.929(c)(1). This again

---

[13] The crux of Beckwith's argument on appeal is that this finding by the ALJ was in error. See filing 14. The Court will outline in detail how the ALJ reached this conclusion in its discussion to follow.

requires the ALJ to review all available evidence, including statements by the claimant, "objective medical evidence,"[14] and "other evidence."[15] 20 C.F.R. § 416.929(c)(1) to (3). The ALJ then considers the claimant's statements about the intensity, persistence, and limiting effects of his symptoms, and evaluates them in relation to the objective medical evidence and other evidence. § 416.929(c)(4). Ultimately, symptoms will be determined to diminish the claimant's capacity for basic work activities, and thus impact the claimant's RFC, "to the extent that [the claimant's] alleged functional limitations and restrictions due to symptoms . . . can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Id*.; § 416.929(d)(4).

Beckwith alleged that the symptoms from his physical impairments included constant pain in his back, knee, neck, ribs and right hand. T16; *see also* T55, 61. He said the pain prevents him from standing for more than 30 minutes or engaging in repetitive hand movements, such as typing. T16; *see also* T61-62.

The ALJ found that although Beckwith's impairments could reasonably be expected to produce his symptoms, Beckwith's statements "concerning the intensity, persistence and limiting effects" were not "entirely consistent with the medical evidence and other evidence."[16] T16.

Accordingly, the ALJ found the following RFC:

---

[14] 20 C.F.R. §§ 416.929(c)(2) & 416.902(g), (k), & (l).

[15] "Other evidence" includes information provided by the claimant, treating and non-treating sources, and other persons. *See* 20 C.F.R. § 416.929(a); *see also* 20 C.F.R. § 416.929(c)(3).

[16] The conclusion of the ALJ regarding Beckwith's physical limitations is not challenged on appeal, so the Court will not describe in detail the reasons the ALJ reached his conclusion.

the residual functional capacity to lift 20 pounds occasionally and 10 pounds frequently. In an 8-hour day, he can stand and walk for 6 hours and sit for 6 hours. With normal breaks, he can complete an 8-hour workday. He can occasionally climb stairs and ladders, balance, stoop, kneel, crouch, and crawl. He must avoid concentrated exposure to wetness, vibration, and hazards such as heights and open machinery.

T15.

#### 4. STEPS FOUR AND FIVE

At step four, the claimant has the burden to prove that he lacks the RFC to perform his past relevant work. *Gonzales*, 465 F.3d at 894; 20 C.F.R. § 416.920(a)(4)(iv) & (f). If the claimant can still do his past relevant work, he will be found to be not disabled, otherwise, the analysis proceeds to step five. At step five, the burden shifts to the Commissioner to prove, considering the claimant's RFC, age, education, and work experience, that there are other jobs in the national economy that the claimant can perform. *Gonzales*, 465 F.3d at 894; 20 C.F.R. § 416.920(a)(4)(v) & (g).

Here, the ALJ determined Beckwith is capable of performing past relevant work as a securities investment analyst. T18. Thus, the ALJ found that Beckwith was not disabled. T19.

### IV. STANDARD OF REVIEW

The Court reviews a denial of benefits by the Commissioner to determine whether the denial is supported by substantial evidence on the record as a whole. *Teague v. Astrue*, 638 F.3d 611, 614 (8th Cir. 2011) (citing 42 U.S.C. § 405(g)). Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion. *Id*. The

Court must consider evidence that both supports and detracts from the ALJ's decision, and will not reverse an administrative decision simply because some evidence may support the opposite conclusion. *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011). If, after reviewing the record, the Court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the Court must affirm the ALJ's decision. *Id*. The Court reviews for substance over form: an arguable deficiency in opinion-writing technique does not require the Court to set aside an administrative finding when that deficiency had no bearing on the outcome. *Buckner v. Astrue*, 646 F.3d 549, 559 (8th Cir. 2011). And the Court defers to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence. *Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011)

## V. DISCUSSION

Beckwith argues that the ALJ erred by concluding that Beckwith's bipolar disorder, panic disorder, major depressive disorder and generalized anxiety disorder are non-severe. Filing 14 at 16. Beckwith suggests that (1) the ALJ's conclusion is not supported by substantial evidence, and (2) the ALJ improperly concluded that the opinions of Drs. Coy and Hutfless were not supported by or consistent with other medical evidence of record. Filing 14 at 16-32. The Court agrees with Beckwith that the ALJ's determination that his mental impairments were non-severe was not supported by substantial evidence in the record.

First, however, Beckwith argues that the term "severe" is counterintuitive and only a *de minimis* standard. And Beckwith reasons the ALJ should have found Beckwith's mental impairments to be severe if they interfere "*in any way,* with [his] ability to do work." Filing 14 at 16 (emphasis

in original). In support of his argument, Beckwith cites *Page v. Astrue*, 484 F.3d 1040 (8th Cir. 2007) and Social Security Ruling 96-3p. On that point, the Court is unpersuaded. First, in *Page,* the Eighth Circuit explained that non-severe impairments are those that "would have no more than a minimal impact on [a claimant's] ability to work." 484 F.3d at 1043 (quoting *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001)). That characterization of the standard is consistent with 20 C.F.R. 416.920a(d)(1), which says a non-severe finding is appropriate where there is no more than a minimal limitation on a claimant's ability to do work. And, Social Security Ruling 96-3p recites similar language.[17] So, "severe impairment" clearly means an impairment that has *more than a minimal impact* on the claimant's ability to work, and not (as Beckwith argues) an impairment that interferes "in any way."[18]

Nevertheless, there must be substantial evidence in the record to support the ALJ's conclusion that Beckwith's mental impairments, singularly and in combination, do not have more than a minimal impact on his ability to work. The Court has taken considerable care to review and summarize, at length, the mental health evidence of record, and still cannot find substantial evidence to support the ALJ's conclusion.

As explained above, for mental impairments the ALJ must use a special two-part technique, first identifying medically determinable impairments, and

---

[17] Social Security Ruling 96-3p was rescinded in June of 2018 because it was "unnecessarily duplicative" of Social Security Ruling 16-3p, which became effective March 28, 2016. Rescission of SSRs 96-3p and 96-4p, 83 Fed. Reg. 27816-01 (June 14, 2018).

[18] Beckwith consistently mischaracterizes the ALJ's decision, suggesting that the ALJ found no mental limitations at all. *See e.g.* filing 14 at 17. However, the ALJ actually concluded that "the claimant's mental impairments cause no more than a mild limitation in any of the broad areas of mental functioning." T14.

then rating the functional limitation, if any, caused by those impairments. 20 C.F.R. § 416.920a(b). Functional limitation is assessed in four broad areas: "[u]nderstand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself." 20 C.F.R. § 416.920a(c)(3). And again, if the four functional areas are rated as "none" or "mild," the ALJ will conclude that any impairments are not severe, unless the evidence indicates more than a minimal limitation to a claimant's ability to do basic work activities. 20 C.F.R. § 416.920a(d)(1).

These paragraph B criteria may be satisfied for purposes of establishing disability if a mental disorder results in extreme limitation of one, or marked limitation of two, of the four areas of functioning. 20 C.F.R. Part 404, Subpart P, Appx. 1, § 12.00(F)(2). The four functional areas are evaluated for a claimant's ability to function "independently, appropriately, effectively, and on a sustained basis." *See id.* The five point scale to describe functioning is further defined as follows: mild limitation is "slightly limited," moderate limitation is "fair," marked limitation is "seriously limited," and extreme limitation is an inability to function. *See id.* And for a claimant's ability to understand, remember or apply information; concentrate, persist, or maintain pace; or adapt and manage oneself; the greatest degree of limitation in any part of the broad area dictates the entire area rating. *See* 20 C.F.R. Part 404, Subpart P, Appx. 1, § 12.00(F)(3)(f).

In reaching his conclusion, the ALJ considered that Beckwith was not fully compliant with treatment recommendations from his mental health providers. T13. Specifically, the ALJ determined that Beckwith refused psychotherapy despite repeated explanations from providers that it was crucial to effective treatment of Beckwith's bipolar disorder. T13. And the ALJ was not persuaded by Beckwith's reasons for not seeking therapy—that he talked

to his priest and didn't like waiting in line at the Douglas County Mental Health Clinic. T13. The ALJ also determined that Beckwith did not fully comply with medications prescribed for his bipolar disorder. T13. Here, the ALJ acknowledged that Beckwith did not avoid medication entirely, but concluded that he stopped taking medications on several occasions. T13. The ALJ was similarly unpersuaded by Beckwith's alleged reasons for stopping his medications, which included vomiting, abdominal pain and dizziness. T13. The ALJ determined that the medical evidence did not support a link between Beckwith's symptoms and his bipolar medication. T13.

So, the ALJ determined that Beckwith's poor compliance with both therapy and medication as suggested by medical professionals was inconsistent with the extreme degree of mental limitation alleged by Beckwith. T13. But the Eighth Circuit has recognized that a mentally ill claimant's noncompliance with treatment can be, and ordinarily is, the result of his mental impairment, and thus is not willful or without justifiable excuse. *Watkins v. Astrue,* 414 F. App'x 894, 896 (8th Cir. 2011); *Conklin v. Astrue*, 360 F. App'x 704, 706 (8th Cir. 2010); *Pate-Fires v. Astrue*, 564 F.3d 935, 945-47 (8th Cir. 2009). And it has specifically held so in cases where the claimant was diagnosed with bipolar disorder. *See Watkins*, 414 Fed. Appx. at 895-96; *Pate-Fires*, 564 F.3d at 937, 945-47.

The ALJ said that Beckwith's reasons for avoiding therapy were not persuasive. T13. And were Beckwith not suffering from a mental illness that resulted in severe anxiety, *see* T335, 452, 546, 667, 681, 712, impaired judgment, T917, 742, 751, 780 and inflated confidence, *see* T742, 751, 780, to name just a few symptoms, his excuses would indeed be inadequate. Beckwith also testified that he is susceptible to panic attacks, and thus avoids crowds, and also has a hard time getting along with other people. T60-61. So, in

addition to the fact that Beckwith's bipolar disorder makes him prone to non-compliance with treatment, *see* DSM-5 at 129, *see also* Watkins, 414 F. App'x at 896, he had specific symptoms which were consistent with his reasons for avoiding therapy. The ALJ did not mention that Beckwith had attended at least a couple of sessions with therapists. *See* T332-35, T767.

The ALJ also reasoned that Beckwith's noncompliance with medications was inconsistent with his claims of disability. And again, if Beckwith were someone whose diagnosed illness did not interfere with his ability to make rational decisions, the ALJ's reasoning would likely hold. However, the record evidence shows that Beckwith clearly vacillated between believing that his medications were causing liver problems, stomach problems, and falls, and wanting to be put on psychotropic medications to control his severe anxiety, depression, and sleep problems. *Compare* T477, 460, 346 *with* T659, 721, 739. Even if there was no conclusive evidence linking those problems with Beckwith's psychotropic medications, there was not a perceived effort on the part of the ALJ to reckon with the fact that Beckwith still subjectively believed a link existed and that his behavior was consistent with his mental health diagnoses.

The ALJ tempered his opinion and said that Beckwith's noncompliance did not "in and of itself" lead to his determination that Beckwith was not disabled. See T13. However, the ALJ did use Beckwith's noncompliance to discredit him. *See* T13-14. And relying on noncompliance as a primary reason for discrediting a claimant's allegedly disabling psychiatric symptoms means that this Court need not fully defer to the ALJ's credibility determination. *Watkins,* 414 F. App'x at 896.

The ALJ also considered the impact of Beckwith's mental impairments on the four broad areas of mental functioning. In doing so, the ALJ examined

both medical and other evidence. First, the ALJ concluded that the medical evidence showed Beckwith's mental impairments caused "some significant symptoms, including a depressed and anxious mood, a flat or restricted affect, distractibility, pressured speech, irritability, flight of ideas, obsessive and grandiose thoughts, impaired judgment, poor impulse control, and hypomanic behavior." T14. But the ALJ also concluded that the above symptoms were sporadic and inconsistent. T14. And the ALJ concluded that Beckwith's "good activities of daily living," good coping skills, reputation as an "excellent historian," and ability to generally cooperate with medical personnel were consistent with only mild limitations in any of the four areas. T14.

The Court agrees that Beckwith had physical exams that were largely normal. However, there were a multitude of exams where Beckwith was not. And over time, nearly all of his treating physicians found that Beckwith's mental health would deteriorate to a point of extreme negative consequences, at which point the provider would confront Beckwith and Beckwith would "fire" them, or vice versa. *See* T338, 451, 446, 782-83, 796, 946. Furthermore, even assuming that the ALJ was right and Beckwith did function normally some of the time, that does not mean his "significant symptoms" don't result in severe impairments in mental functioning when he is at his worst.

Beckwith's "good activities of daily living" also contributed to the ALJ's determination that Beckwith's limitations were merely mild. *See* T14. The ALJ does not list which daily activities are "good." But, the citations to the record do not support the ALJ's conclusion. First, he cites to a self-report from Beckwith dated January 2018. *See* T14. Beckwith was still living alone, and therefore doing "laundry and dishes," and driving "no further than 10 miles at a time." T209. Beckwith also reported that he went to church but had no other social activities, would read, and watched the news on TV at night. T209. But

Beckwith also complained that he was unable to sleep for days at a time, did very few if any errands, and described his symptoms as "a nightmare I can't get over." T209.

The ALJ also cited generally to hearing testimony. T14 However, at the hearing Beckwith testified consistently with his self-report in that he could not sleep for days at a time, had difficulty driving, and did not do household chores or grocery shopping. *See* T52, 55, 59-62. If anything, Beckwith's activities of daily living had deteriorated from the time of his self-report to the hearing because he was living full time with his mother instead of alone.

And the ALJ cited to records from Dr. Coy, which indicate that Beckwith was temporarily going to a gym on a daily basis. T14, 739. However, at the very next appointment, Coy noted that Beckwith stopped going to the gym due to pain from his car accident. T748. And there is no indication that Beckwith ever started going again. *See* T757, 767, 777, 786, 795.

The ALJ also relied on records from Dr. Hutfless, which do not discuss activities of daily living in any great detail. *See* T14, T945-56. Hutfless did note in late August 2018 that Beckwith said he was taking care of his father because his mother sustained an injury that temporarily put her in a rehabilitation center. *See* T950. But there is also record evidence that Beckwith's father was in a nursing home. *See* T659, 667. And the ALJ did not ask to clarify whether Beckwith had in fact taken on additional responsibilities at home. Rather, as mentioned above, at the hearing Beckwith testified that his activities of daily living were very limited and that his mother was home and taking care of most of the housework.

Even if Beckwith *did* have good activities of daily living, which there is little evidence to support, the Eighth Circuit has "oft-expressed skepticism about the probative value of evidence of day-to-day activities." *Reed v.*

*Barnhart,* 399 F.3d 917, 924. And the Circuit has found it "necessary from time to time" to remind the Commissioner "'that to find a claimant has the residual functional capacity to perform a certain type of work, the claimant must have the ability to perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" *Id.* at 923. The Eighth Circuit has "repeatedly observed that the ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work." *Id.* (quotations omitted). Beckwith's activities of reading, attending church, exercising and watching television should not be the basis for a finding that he can perform his past relevant work as an investment analyst. *See id.*

In addition, the ALJ relied on record evidence that Beckwith was an "excellent historian," "has coped well with many recent losses and life challenges," and was "generally cooperative and appropriate with medical personnel." T14. Dr. Coy did note on Beckwith's first visit that he was an "excellent historian." T504. And that note continued to appear in Coy's treatment records for the length of their treatment relationship. *See* T795. However, Coy's last treatment record is strong evidence that while Beckwith may have sometimes coped "well," and at times been "cooperative and appropriate," there were other times that he coped poorly and could charitably be described as uncooperative. On that final day, Coy noted that Beckwith was "miserable" because his ex-wife had "turned [his] sons against [him]." T795. And, at that visit, Coy confronted Beckwith about an after-hours call where Beckwith threatened to kill himself. T795. Ultimately, on that day Coy ended his treatment relationship with Beckwith and recommended he seek out an agency with "higher levels of care," for his "complex case." T795. This record is

not an outlier. As discussed in detail above, Beckwith's mood and stability were often volatile.

Statements from Dr. Coy and Dr. Hutfless were also reviewed by the ALJ. T14; *see also* T290-96; T590; T966. The ALJ determined that while Coy and Hutfless reached similar conclusions regarding Beckwith's functional limitations (that they were severe), those conclusions were inconsistent with Beckwith's poor compliance with treatment and Beckwith's own statements at the hearing that he believes he is capable of working. T14; *see also* T52. "Most importantly," the ALJ concluded that Coy and Hutfless's opinions were inconsistent with their own clinical findings and observations. T14. In particular, the ALJ found no mention in the medical records of the "types of extreme concentration difficulties" suggested by the doctors in their opinions. T14-15. Furthermore, the ALJ found the clinical findings indicated Beckwith had greater mental abilities than Coy and Hutfless opined. T15. So, the ALJ concluded that both opinions were unpersuasive. T15.

As set forth in detail above, however, Beckwith's non-compliance with treatment is hardly at odds with Coy's and Hutfless's opinions regarding Beckwith's limitations. In fact, as the Eighth Circuit has explained, Beckwith's extreme limitations likely contribute to and explain Beckwith's noncompliance with treatment. Furthermore, the Court is unpersuaded by the ALJ's reliance on Beckwith's own hearing testimony about his ability to work. The dialogue between Beckwith and the ALJ was strained and while Beckwith said "I always think I can work," he also said he won't sleep for five days at a time, then crashes for two days and has not been able to work due to his manic episodes and inability to get along with others. *See* T52-55. And Beckwith never said he could return to his past relevant work as an investment banker, nor does the record support such a finding. *See* T52-55.

- 42 -

As far as Coy's and Hutfless's opinions being at odds with their own clinical findings and notes, the Court agrees with the ALJ that extreme limitations in *all* of the areas of functioning may not be supported by the medical records. *See* T592-93, 968-69. However, the ALJ must consider all relevant and available medical evidence when determining functional limitation. *See* 20 C.F.R. § 416.920a(c)(1). And here, the medical evidence of record points to more than mild limitations, and likely marked or extreme limitations in Beckwith's ability to, for example: recognize a mistake and correct it, identify and solve problems, use reason and judgment, handle conflicts, respond to criticism, sustain an ordinary routine and regular work attendance, stay focused on a task, regulate his emotions, and maintain well-being. *See* 20 C.F.R. Part 404, Subpart P, Appx. 1, § 12.00(E).

Finally, the ALJ found the opinions of the state agency psychological consultants persuasive. T15. Those opinions referenced Beckwith's activities of daily living, and his lack of hospitalization or regular psychotherapy for any of his mental impairments. T15. He also found the opinions to be consistent with the mental status examinations in the record, which reflected Beckwith's symptoms to be sporadic. T15. But the ALJ's reliance on the consultant's opinions was in error.

While the ALJ did not explicitly mention Beckwith's obvious problems with alcohol and prescription drug abuse, the state agency consultants did, and this Court would be remiss not to acknowledge them. *See* T566. The key factor in determining whether drug addiction or alcoholism is material to a determination of disability is whether the claimant would still be found disabled if he or she stopped using drugs or alcohol. *Pettit v. Apfel*, 218 F.3d 901, 902 (8th Cir. 2000). But as previously mentioned, substance abuse disorders—especially alcohol abuse disorder—are common among those

diagnosed with bipolar disorder. DSM-5 at 132. And to the extent that the consulting psychiatrists attributed Beckwith's symptoms to alcohol abuse, it was the ALJ's responsibility to determine whether his bipolar disorder would still be disabling absent alcohol or drug abuse. *See Pettit*, 218 F.3d at 902. This did not occur.

For the same reasons that the ALJ improperly relied on Beckwith's activities of daily living, the argument is similarly flawed as advanced by the psychological consultants. And a person need not be psychiatrically hospitalized in order to have severe mental health diagnoses and more than mild limitations. *See* 20 C.F.R. § 416.920a.

Furthermore, the agency chose not to have Beckwith examined and the consultants did not review a significant portion of Beckwith's medical records.[19] The opinions of non-treating practitioners who have attempted to evaluate the claimant without examination do not normally constitute substantial evidence on the record as a whole upon which to base a denial of benefits. *Shontos v. Barnhart*, 328 F.3d 418, 417 (8th Cir. 2003); *see also* 20

---

[19] The non-examining reviews were issued initially on March 11, 2018, T551-56, and on reconsideration on June 7, 2018, T75-86. And the review on reconsideration only took into account additional records from Dr. Morrison, an orthopedic surgeon, who never evaluated Beckwith's mental health. *See* T80, T577-79. The full administrative record obviously contains records after that date, including relevant records from Drs. Coy and Hutfless. And, it appears that, as Beckwith claims, the consulting examiners did not review almost 400 pages of medical records. *See* T80, T589-979. And the opinion of a nonexamining consulting physician is afforded less weight if the consulting physician did not have access to relevant medical records, including relevant medical records made after the date of evaluation. *McCoy v. Astrue*, 648 F.3d 605, 616 (8th Cir. 2011).

C.F.R. § 416.920c. Therefore, the opinions of the psychological consultants do not provide substantial evidence to support the ALJ's determination.

In sum, there is simply not substantial evidence to support this respected ALJ's conclusion that Beckwith's mental impairments singularly and in combination only resulted in mild limitations. Therefore, it was improper for the ALJ to conclude that Beckwith's bipolar disorder, panic disorder, major depressive disorder, and generalized anxiety disorder were non-severe. And this Court concludes that, as a matter of law, Beckwith's mental impairments are severe and must be accounted for in his RFC.

Beckwith also argues that the record evidence supports a finding that his mental impairments are work-preclusive. Filing 14 at 17. While the Court is skeptical that Beckwith is capable of performing his past relevant work as an investment analyst, on this record it cannot conclude that Beckwith's mental limitations are entirely work-preclusive. It will be up to the Commissioner to craft an RFC that properly accounts for Beckwith's severe mental health impairments and includes limitations as appropriate.

The Court will therefore reverse the Commissioner's decision and remand for further proceedings consistent with this order. *See* 42 U.S.C. 405(g).

IT IS ORDERED:

1.    Beckwith's motion for an order reversing the Commissioner's final decision (filing 13) is granted.

2.    The Commissioner's motion for an order affirming the Commissioner's final decision (filing 17) is denied.

- 45 -

3.     This matter is remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

4.     A separate judgment will be entered.

Dated this 23rd day of June, 2020.

BY THE COURT:

John M. Gerrard
Chief United States District Judge